**REVERSE, REMAND, RENDER, and VACATE; and Opinion Filed August 28, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

### No. 05-12-00092-CV

**MICHAEL ARNOLD, JANET ARNOLD, STEVE SOUTH, AS TRUSTEE AND ON BEHALF OF THE SOUTH LIVING TRUST, JOHN S. FERRIS, M. D., CHRISTINE DUNCAN, AND ALL OTHERS SIMILARLY SITUATED, Appellants**

**V.**

**LIFE PARTNERS, INC., ABUNDANT INCOME LLC, AND MILKIE/FERGUSON INVESTMENT, INC., Appellees**

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 11-02995**

### OPINION

Before Justices Moseley, O'Neill, and Lewis
Opinion by Justice O'Neill

Appellants Michael Arnold, Janet Arnold, Steve South, as trustee and on behalf of the

South Living Trust, John S. Ferris, M.D., Christine Duncan, and all others similarly situated

appeal the trial court's order granting summary judgment in favor of Life Partners, Inc.,

Abundant Income LLC, and Milkie Ferguson Investment, Inc.[1] Appellants argue the trial court

erred in granting summary judgment because Life Partners' and Milkie/Ferguson's life

settlements are securities that meet the requirements of an investment contract. They also

contend the life settlements are not insurance contracts exempted from the Texas Securities Act.

Appellants further argue Life Partners has not proven its statute of limitations affirmative

---

[1] In an amended notice of appeal, appellants dropped their appeal of the summary judgment in favor of Abundant Income LLC.

defense as a matter of law.[2]  And finally, appellants claim the trial court abused its discretion by granting a sanctions order against them.  We affirm in part, reverse and render in part, and reverse and remand for further proceedings.

## Factual Background

This is an appeal in which appellants asserted claims under the Texas Securities Act ("TSA") for registration violations as well as for alleged material misrepresentations.  *See* TEX. REV. CIV. STAT. ANN. arts. 581–33A(1), (2) (West Supp. 2010).

As background, Life Partners is a financial services company engaged in buying life insurance policies and selling interests in those policies to investors.  Such transactions are known as "viatical settlements" or "life settlements."  Life Partners works to locate people who wish to sell their life insurance policies for an amount less than the face value.  Viatical and life settlement investors acquire a fractional interest in the life insurance policies at a discount to the policy's face value, and the insured receives an immediate cash settlement.  The most critical element determining whether an investor will make a profit on the life settlement transaction is the "discount" at which Life Partners acquires a life insurance policy from a viator.  However, life settlement purchasers never know the exact amount of money Life Partners pays any viator for a life insurance policy.

After Life Partners purchases a life settlement account and locates an investor, funds are deposited into a trust account.  Policy ownership is changed from the viator to Life Partners.  Investors are never named the owner or beneficiary of the policy, but rather Life Partners holds the policies as "agents" for the investors.  In some situations, investors may be required to make additional premium payments to maintain the insurance policy if the insured outlives the life expectancy calculated by Life Partners.

---

[2] Milkie/Ferguson did not raise this argument in its motion for summary judgment.

Michael and Janet Arnold filed their original petition on March 14, 2011 alleging that Life Partners "engaged in a scheme to offer and sell unregistered securities in violation of Texas law." *See* TEX. REV. CIV. STAT. art. 581–33(A)(1). They specifically claimed Life Partners' "life settlements" were in reality "investment contracts" and therefore "securities" requiring registration under the Texas Securities Act. Thus, because Life Partners violated the TSA, they were entitled to relief in the form of rescission or damages. The Arnolds also asserted class action allegations.

Plaintiffs' first amended class action petition added plaintiffs Steve South, as trustee for and on behalf of the South Living Trust, and John S. Ferris, M.D. It also added defendant Milkie/Ferguson Investment, Inc., who acted as a broker after Life Partners bundled together groups of policies. The appellants' allegations, however, remained the same.

Plaintiffs' second amended class action petition added an allegation under article 581–33(A)(2) that the life settlement investments sold by appellees "were sold by means of an untrue statement of a material fact or an omission to state material facts in violation of the TSA." Appellants' specifically argued appellees told them the life settlements were not securities, which they assert was an untrue statement of material fact.

Appellees filed a motion and amended motion for summary judgment arguing that as a matter of law (1) the life settlements are not investment contracts or securities; therefore, no violation of the TSA occurred; (2) the TSA specifically excludes contracts or agreements "in relation to and in consequence of" insurance policies from its definition of "securities"; (3) the life settlements are not "evidence of indebtedness" under the TSA; (4) because the life settlements are not securities, appellees cannot be liable under the TSA for any securities fraud allegations; and (5) the majority of appellants' claims are barred by the TSA's statutes of limitations provision.

Appellants responded the authority heavily relied on by appellees' was not binding on the trial court and recent developments in the law provided persuasive authority that such life settlements are in fact securities requiring compliance with the TSA. Further, they argued life settlement contracts are not excluded from registration as securities because life settlements are not governed by the Texas Insurance Code, as "a viatical settlement is not an insurance policy and the selling of fractional interests in insurance policies is not part of the business of insurance." And lastly, they argued their claims were not time-barred because their initial investments were within the statute of limitations. Moreover, they further argued any claims that might be outside the limitations period were revived when they were required to make additional payments to retain their interests, which restarted the clock on the limitations period.

On September 26, 2011, the trial court granted appellees' amended motion for partial summary judgment.

After granting appellees' partial motion for summary judgment, appellees' then filed a motion for partial summary judgment on their counterclaims against appellants. They argued appellants' claims were "groundless and brought in bad faith and/or for purposes of harassment, and therefore, violated Rule 13 of the Texas Rules of Civil Procedure, as well as Sections 9.011 and 10.001 of the Texas Civil Practice and Remedies Code." Appellants responded the motion for summary judgment was really a motion for sanctions brought pursuant to three different statutory provisions, none of which the trial court should consider. On November 29, 2011, the trial court signed an "Order Regarding Sanctions" and stated "the pleadings as complained of were frivolous and without basis in fact or law."

Appellants timely filed their notice of appeal challenging the orders granting appellees' amended motions for partial summary judgment and the sanctions order.

**Standard of Review**

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id*. Under Texas Rule of Civil Procedure 166a(c), the party moving for summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id*.

We review sanctions orders under an abuse of discretion standard. *Armstrong v. Collin Cnty. Bail Bond Bd*., 233 S.W.3d 57, 60 (Tex. App.—Dallas 2007, no pet.). The party seeking sanctions bears the burden of overcoming the general presumption that pleadings were filed in good faith. *Id*.

**Discussion**

We begin by noting that while numerous pleadings in the trial court have been filed on behalf of appellants and "those similarly situated" and both parties reference the "class," the record does not show that the trial court ever certified a class of investors allegedly affected by Life Partners and Milkie/Ferguson. Thus, this opinion is binding only on those who directly appealed the trial court's orders and has no binding authority on any other investor in Life Partners' viatical settlements.

The first issue we must decide is whether a life settlement is considered an investment contract and therefore a security, as defined by the TSA. Appellants rely on *Searsy v. Commercial Trading Corporation*, 560 S.W.2d 637 (Tex. 1977) and *S.E.C. v. Mutual Benefits Corporation*, 408 F.3d 737 (11th Cir. 2005) while appellees rely on *S.E.C. v. Life Partners, Inc*., 87 F.3d 536 (D.C. Cir. 1996) and *Griffitts v. Life Partners, Inc*., No. 10-01-00271-CV, 2004 WL 1178418 (Tex. App.—Waco May 26, 2004, no pet.) (mem. op.).

Securities are defined under the TSA as follows:

> The term "security" or "securities" shall include any share, stock, . . . note, bond, debenture, mortgage certificate or other evidence of indebtedness . . . or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not.

TEX. REV. CIV. STAT. art. 581–4(A). The term "investment contract" was construed by the United States Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). The Court concluded the test for an investment contract is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* Texas adopted the *Howey* test in *Searsy v. Commercial Trading Corporation.* The Texas Supreme Court reiterated the four requirements as (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profit; (4) solely from the efforts of others. 460 S.W.2d at 640.

In *Searsy*, the issue was whether the sale of commodity options, which were alleged to be unregistered securities, were in fact investment contracts falling under the definition of securities for purposes of the TSA. The court noted there was little dispute as to the first and third *Searsy* elements. Thus, the court focused its analysis on whether a common enterprise existed solely from the efforts of others.

The court recognized two types of common enterprises or "commonality" elements, which included horizontal commonality and vertical commonality. The appellee argued the commonality element was missing because the profits of each customer depended on the fluctuation of the commodity market, and the customer's own investment decisions. *Id.* at 640.

The court agreed there was no horizontal commonality because horizontal commonality is between investors and the success of one investor is concomitant with the success of other

investors. *Id*. It concluded that "obviously, different customers of CTC had varying investment results because different commodity options were bought and exercised at different times." *Id*. However, it acknowledged that more recent authority allowed for vertical commonality, which showed a common enterprise between the investor and promoter, whereas the success of the investor is dependent upon the efforts and success of the promoter. *Id*. (citing *S.E.C. v. Koscot Interplanetary, Inc*., 497 F.2d 473 (5th Cir. 1974)). The court concluded that because the ability of CTC to perform its contractual obligation was solely dependent on the success of the hedging program conducted by another company, the requisite common enterprise requirement was met. *Id*.

The court next discussed whether the profits anticipated by investors would result "solely from the efforts of others." *Id*. It noted that early cases construing this requirement of the *Howey* test gave literal effect to the phrase "solely from the efforts of others." *Id*. at 641. The court determined the more recent trend was to use a more "realistic test" that analyzed "whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id*. To conclude otherwise, could allow the "solely from the efforts of others" requirements to be easily evaded by an investor exerting only a modicum of effort. *Id*.

In reaching its conclusion that the fourth *Howey* element was met, the court noted CTC actively sought inexperienced investors, and the salesmen provided the inexperienced investors with market reports and recommendations. *Id*. at 641. Given the speculative nature of commodities, the investor was heavily dependent upon CTC personnel and advice. *Id*. The court also quoted the following from an Austin Court of Civil Appeals:

> Once a customer has parted with his money, he is dependent upon the financial responsibility, business ability, integrity, expertise and market advice of appellant and, unknown to him, third parties who participate in appellant's commodity trading. It is the

essential managerial efforts of those other than the investor which affect the failure or success of the enterprise. Investors are not required to, and they do not, exert any significant efforts in order to make a profit on their investment. For all practical purposes the critical managerial decisions affecting the investor's funds are solely within the control of appellant. And finally, an investor cannot without the actual assistance of appellant, exercise his option and receive his profit.

*Id.* (citing *Clayton Brokerage Co. of St. Louis, Inc. v. Mouer*, 520 S.W.2d 802, 809 (Tex. Civ. App.—Austin writ ref'd n.r.e.), *dism'd as moot on reh'g per curiam*, 531 S.W.2d 805 (Tex. 1975). Thus, the court concluded the commodity option sold by CTC met the requirements of an "investment contract" as set forth in *Howey* and fell within the definition of security under the TSA. *Id.*

In 1996, the D.C. Circuit decided whether a viatical settlement is exempt from securities law. *See S.E.C. v. Life Partners, Inc.*, 87 F.3d 536, 537 (D.C. Cir. 1996). The SEC argued the fractional interests marketed to investors in life insurance policies were securities required to be registered under the Securities Exchange Act of 1934. *Id.* Life Partners argued viatical settlements were exempt as insurance contracts, and they were not securities as defined by the Act. *Id.* The court acknowledged the *Howey* test, but reasoned Life Partners' contracts did not depend upon the efforts of others, the fourth *Howey* element; therefore, they were not securities. *Id.* at 540.

In reaching this conclusion, the court noted that any increase in the value of a viatical contract required no "development" at all, but rather "depended entirely upon the inexorable passage of time and the inevitable death of the insured." *Id.* at 543. While the SEC argued the investors of such contracts depended predominantly upon the efforts of Life Partners' efforts, which provided pre-purchase expertise in identifying policy holders, Life Partners claimed its pre-purchase functions were wholly irrelevant, and its post-purchase functions should not count because they were only ministerial. *Id.* at 545. "On this view, once the transaction closes, the

–8–

investors do not look to the efforts of others for their profits because the only variable affecting profits is the timing of the insureds' death, which is outside [its] control." *Id*.

The D.C. Circuit strictly interpreted the *Howey* requirement that profits be generated "solely" from the efforts of others. *Id*. It then distinguished between pre-purchase and post-purchase activities. Again, the court noted once an investor purchased a policy, there was nothing Life Partners could do to affect the investor's rate of return because it had no control over when the insured would die. *Id*. Therefore, the court found that none of the "ministerial functions have a material impact upon the profits of the investors." *Id*.

The court then turned to whether Life Partners' pre-purchase efforts provided support under the *Howey* test as "the efforts of others." The SEC encouraged the court to not discount the significance of its pre-purchase activities insofar as they counted towards "the efforts of others." *Id*. at 547. Life Partners used financial planners to evaluate an insured's medical condition, to review the insurance policy, to negotiate a purchase price, and to prepare the legal documents. *Id*. at 539. The SEC argued Life Partners continued to perform some of these functions right up until the closing of the transaction with the investor. *Id*. at 547. The SEC claimed it would be "hypertechnical" to discount the importance of its pre-purchase entrepreneurial functions, and the Supreme Court did not draw such a bright line distinction in *Howey*. *Id*.

The D.C. Circuit was unpersuaded by the arguments:

> If the investor's profits depend thereafter predominantly upon the promoter's efforts, then the investor may benefit from the disclosure and other requirements of the federal securities laws. But if the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment, and if neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished.

*Id*. at 547. The combination of Life Partners' pre-purchase services as finder-promoter and its largely ministerial post-purchase services was not enough to persuade the court that the investors' profits flowed predominantly from the efforts of others. *Id*. at 548. Accordingly, because the SEC failed to satisfy this element of the *Howey* test, the court concluded viatical settlements marketed by Life Partners were not securities. *Id*.

The only Texas court to address the issue of whether viatical settlements are investment contracts relied heavily on the D.C. Circuit's *Life Partners'* opinion. And as expected, appellees' argue this Court must follow this "controlling authority." *See Griffitts*, 2004 WL 1178418, at *1. In that case, similar to the D.C. Circuit opinion, Griffitts argued Life Partners' life insurance policies violated the requirements of the TSA. *Id*. The trial court granted summary judgment in favor of Life Partners on two grounds: (1) the life insurance policies, or portions thereof, were not securities because they were not "investment contracts, notes, or evidence of indebtedness within the meaning of the Act," and (2) life insurance policies were expressly excluded from the definition of securities under the TSA. *Id*.

Relying on the D.C. Circuit's opinion, the court first concluded that no enterprise existed under *Searsy* or *Howey* because "[w]here a promoter merely holds an investment in anticipation of appreciation or maturity, no enterprise exists." *Id*. at *2. If further concluded, like the D.C. Circuit, that the profitability of Griffitts' interests in life insurance policies was not determined by any managerial efforts on the part of Life Partners, but was instead determined by the mortality of the insureds. *Id*. After Griffitts paid its fee to Life Partners, the two did not share a common interest in the profitability of the policies. *Id*. "And any ministerial post-purchase efforts on the part of Life Partners . . . could have no effect on the profitability of the policies, which was overwhelmingly determined by how long the insured lived." *Id*. Accordingly, the

Waco court concluded Griffitts' interests in the life insurance policies did not constitute investment contracts, and Life Partners was not in violation of the TSA. *Id.*

Here, appellants argue neither the D.C. Circuit nor the Waco Court of Appeals is binding authority on this court, and we agree. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) ("While Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision, they are obligated to follow only higher Texas courts and the Unites States Supreme Court.") Rather, we must reach our best conclusion based on the law as it stands before us.

In addition to *Searsy*, appellants encourage this Court to follow *S.E.C. v. Mutual Benefits Corporation*, 408 F.3d 737 (11th Cir. 2005), which they contend shows a trend that viatical settlements are being treated throughout the country as securities.[3] In that case, MBC was a viatical settlement provider, who identified terminally ill insureds, negotiated purchase prices, bid on policies, and obtained life expectancy evaluations. *Id.* at 738. MBC created the legal documents needed to conclude all transactions and solicited funds from investors directly from agents. *Id.* Once an investor invested in a policy, MBC paid premiums, monitored the health of the insureds, collected the benefits upon death, and distributed the proceeds to investors. *Id.* If an insured lived beyond his life expectancy, the term of the investment was extended by either new investor funds or additional funds from the original investors. *Id.* at 739.

The SEC argued the trial court erred in concluding its viatical settlement contracts qualified as investment contracts. It argued the court should adopt the reasoning of the D.C.

---

[3] Many state courts have interpreted their uniform security laws to include viatical settlements as an investment contract that constitutes a security. *Siporin v. Carrington*, 23 P.3d 92, 97 (Ariz. Ct. App. 2001) (applying the *Howey* test and concluding viatical settlements are securities under the Arizona Securities Act); *Joseph v. Viatica Mgmt.*, *LLC*, 55 P.3d 264, 267 (Colo. App. 2002) (applying *Howey* and concluding viatical settlements are securities under the Colorado Securities Act); *Allen v. Jones*, 604 S.E.2d 644, 646–47 (Ga. Ct. App. 2004) (applying *Howey* and concluding viatical settlements are securities under Georgia Securities Act); *Poyser v. Flora*, 780 N.E.2d 1191, 1196–97 (Ind. Ct. App. 2003) (applying the *Howey* test and concluding viatical settlements are securities under the Indiana Securities Act); *Michelson v. Voison*, 658 N.W.2d 188, 191 (Mich. Ct. App. 2003) (concluding viatical settlements are included in the definition of "security" after broadly interpreting its securities act and considering a bulletin written by the Michigan Department of Commerce Corporation & Securities Bureau, which stated viatical settlements fell within the definition of a "security").

Circuit in *Life Partners*. *Id.* at 741. In discussing the *Howey* test pronounced by the Supreme Court, the Eleventh Circuit noted "this approach 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promises of profits.'" *Id.* (citing *Howey*, 328 U.S. at 299). Similar to *Searsy*, the only real dispute was whether the investor's expectation of profit was based "solely on the efforts of the promoter or third party." *Id.* at 743.

The court refused to make a distinction, as the D.C. Circuit made in *Life Partners*, between a promoter's activities prior to his having use of an investor's money and his activities after he had use of the money. *Id.* The court was not convinced that *Howey* required "such a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter." *Id.* Rather, it believed the Security Act should be broadly applied to all "schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* (citing *Howey*, 328 U.S. at 299). It continued to opine that although the efforts of a promoter or third party may be more easily satisfied by post-purchase activities, the court did not see a valid reason for excluding pre-purchase managerial activities from the analysis. *Id.*

As noted above, MBC had significant involvement in the pre-investment activities. Moreover, investors had no ability to assess the accuracy of the representations made as to the life-expectancy evaluations. *Id.* While the court acknowledged MBC's post-investment activities, it focused more on the fact that a flexible standard should be applied, which covers pre-investment activities. *Id.* at 745. Thus, the court upheld the district court's ruling that MBC's viatical settlement contracts qualified as "investment contracts" under the Securities Act of 1933 and 1934. *Id.*

While appellees argue we must follow *Griffitts* because that "decision remains intact as to LPI and its life settlements unless and until the Texas Legislature amends the TSA to specifically

include life settlements within the definition of 'security,'" we do not agree. As previously stated, we are not bound by the opinion of another court of appeals and given the scant Texas case law in this area, we may look to other state and federal case law for guidance.

Appellees admit that their business model includes using agents to identify insureds, negotiate the price of the policy, evaluate the terms and conditions of the policy, purchase the policy, find potential investors, evaluate the health of the insured, and when the insured dies, submit death benefits to the investors. A "policy funding agreement" states the Life Partner agent shall perform the following duties:

> a. review life insurance policies referred to Agent for purchase as a life settlement,
>
> b. qualify policies based upon underwriting criteria and other relevant guidelines pursuant to the above referenced Agency Agreement, arrange for the purchase of the policy if it meets said criteria and guidelines, and provide information of such transaction to Purchaser,
>
> c. forward this Policy Funding Agreement and other necessary documents to the Escrow Agent in accordance with Section 1.02 of this agreement,
>
> d. prepare and maintain a confidential Purchaser's file containing all data and documents pertaining to the purchaser's acquisition of said settlement.

Appellants invested with the expectation to make a profit.

Further, investors were given a Life Settlement Risk Factor, which stated "Read Before You Invest." It explains that Life Partners obtains life expectancies for its life settlements from a qualified third-party physician or life expectancy provider company; however, any life expectancy provided is only an estimate. It further emphasized "**Privacy laws and other factors may limit the information you receive about the insured; particularly after the purchase of the policy; you will be dependent upon LPI to track insureds' health status and whereabouts.**" (Emphasis in original.) Thus, investors had to rely on Life Partners' medical

–13–

assessments of patients, the patients' policies, and for Life Partners to track the health of the insureds. Appellants received what Life Partners considered "adequate information about the policy" to determine whether to invest. However, at the end of the day, appellants had to rely on the information provided by Life Partners. Moreover, appellants also had to rely on Life Partners' subscriptions to notification services and public record information to track when an insured had died.

The disclosure also notified appellants that each policy interest purchased included an "Acquisition Cost." This cost included amounts escrowed to keep the policy in force, fees paid to the life settlement broker representing the policy owner in the transaction, fees paid to the life expectancy provider company or physician who provided the life expectancy evaluation, and among other fees, fees to Life Partners for underwriting and facilitating the purchase of the policy.

The disclosure also makes it clear that "**You will be dependent upon LPI and Dunnam & Dunnam for premium administration tracking, and policy benefit collection services.**" (Emphasis in original.) Once again, this shows appellants had to rely on Life Partners' expertise to perform investment tasks and its managerial efforts to make profits in their viatical settlements.

Based on these facts and a review of the case law, we are persuaded to follow the reasoned holding of the Eleventh Circuit in *S.E.C. v. Mutual Benefits Corp*., 408 F.3d 737 (11th Cir. 2005) and other courts that have followed. *See, e.g, Siporin v. Carrington*, 23 P.3d 92, 97 (Ariz. Ct. App. 2001); *Joseph v. Viatica, Mgmt*., *LLC*, 55 P.3d 264, 266–68 (Colo. App. 2002); *Allen v. Jones*, 604 S.E.2d 644, 645–47 (Ga. Ct. App. 2004). There is no dispute that Life Partners viatical settlements involved an investment of money in a common enterprise or that appellants invested with the reasonable expectation of profits. Thus, the main dispute is the

fourth *Howey* factor—whether the profits were derived from the entrepreneurial or managerial efforts of others. We disagree with the *Griffitts'* court's reliance on the D.C. Circuit opinion that determined the profitability of interests in life insurance policies is "not determined by any managerial efforts on the part of Life Partners, but is determined by the mortality of the insureds*."* *Griffitts*, 2004 WL 1178418, at *2. In reaching this conclusion, the Waco court overlooked the fact that the Supreme Court in *Howey* did not distinguish between pre- and post-purchase activities of a promoter.

When as noted above, the profits appellants expected to realize from their investments depended almost entirely upon Life Partners' expertise in choosing the policies, estimating life expectancy, negotiating an advantageous price, and monitoring the policy to keep it in force, these activities must not be considered lightly. We agree with the *Poyser* court in which it stated

> *Life Partners* disregards the premise underlying the *Howey* test—that is, that the statutory definition of "security" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*Poyser*, 780 N.E.2d at 1196–97 (quoting *Howey*, 328 U.S. at 299). Thus, the rigidity of the bright-line rule contrasting pre- and post-purchase activities pronounced by the D.C. Circuit in *Life Partners*, as relied on by the *Griffitts'* court, contravenes the policy identified in *Howey*. *See Searsy*, 560 S.W.2d at 640 (adopting the *Howey* test for Texas).

The efforts of Life Partners are undeniably significant ones which affected the success or failure of the enterprise and therefore, the activities, albeit pre-sale, were sufficient to classify the transaction as an investment contract. In reaching this conclusion, we disagree with *Life Partners* and the *Griffitts'* court that the only factor determining the success of the investment was the date of death of the viator–an event over which it had no control. As previously stated, we must not turn a blind eye to Life Partners' involvement prior to the death of the viator that

–15–

impacted the outcome of appellants' investment, particularly when the *Howey* court failed to draw such a distinction.

> What truly determines viatical settlements profitability is the realization, over time, of an outcome predicated by the seller through its analyses of the viator's life expectancy, the soundness of the insurer, the actions needed to keep the policy in effect for the original face amount and the insurer's unconditional liability under the policy's terms.

*Siporin*, 200 23 P.3d at 99. Therefore, we hold that the viatical settlements sold by Life Partners are investment contracts, as a matter of law, under the Texas Security Act and meet the definition of "security." TEX. REV. CIV. STAT. art. 581–4(A).

In reaching this conclusion, we are not persuaded by Life Partners' argument that viatical settlements are excluded from the definition because they are insurance policies. The TSA specifically provides that the definition of "security" "shall not apply to any insurance policy . . . issued by an insurance company subject to the supervision or control of the Board of Insurance Commissioners when the form of such policy or contract has been duly filed with the Board as now or hereafter required by law." *Id*. While we agree with Life Partners that the life settlements are produced from life insurance policies, we cannot ignore the rest of the wording of art. 581–4(A). There is no evidence that Life Partners is an insurance company subject to the supervision or control of the Board of Insurance Commissioners.

Further, the Tyler Court of Appeals reached this conclusion in *Employers Reinsurance Corporation v. Threlkeld & Co. Insurance Agency*, 152 S.W.3d 595, 599 (Tex. App.—Tyler 2003, pet. denied). In that case, Threlkeld argued it was in the "business of insurance" in soliciting individual investors to purchase viatical settlement agreements because that act was "recognized as constituting insurance business within the meaning of statues relating to insurance." *Id*. (citing TEX. INS. CODE ANN. § 101.051(b)(8) (Vernon Supp. 2003)). However, the court concluded "there is nothing indicating that selling viatical settlements is part of the

–16–

'business of insurance.'" *Id.* It supported its conclusion further by relying on the *Life Partners* D.C. Circuit opinion in which that court stated:

> The seller of a viatical settlement is not foregoing current consumption in order to protect against future risk, as does the buyer of an insurance policy. Quite the contrary: he is giving up the protection of a policy already in effect in favor of current consumption . . . Moreover there is no reason to expect that state insurance commissioners would regard even the pooling of viatical contracts as a form of insurance. To the extent that regulation of insurance companies is prompted by concern over their ability to pay benefits when due, that concern is simply not applicable to investors in a viatical settlement because the insured receives payment from the investors at the outset; thereafter the investor has no further liability to the insured.

*Life Partners*, 87 F.3d at 541–42; *see also Threlkeld*, 152 S.W.3d at 599. Accordingly, we are not persuaded by Life Partners' argument that viatical settlements fall under the exception to the definition of a security because they are insurance policies.

Having concluded viatical settlements are securities under the TSA, we must now address Life Partners' argument that the applicable statute of limitations, raised as an affirmative defense, bars appellants' claims. When a party raises the affirmative defense of statute of limitations, the party must conclusively prove when the cause of action accrued. *Mock v. Presbyterian Hosp. of Plano*, 379 S.W.3d 391, 393 (Tex. App.—Dallas 2012, pet. denied).

The TSA provides that "no person may sue under Section 33A(1) . . . more than three years after the sale" of a security. TEX. REV. CIV. STAT. ANN. art. 581–33H(1). It further states "no person may sue under section 33A(2) . . . (a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (b) more than five years after the sale . . . ." *Id.* art. 581–33H(2).

Life Partners attached to its amended motion for summary judgment the affidavit of Scott Peden, the President of Life Partners. He stated that in his capacity as president, he had access and personal knowledge of Life Partners' business records maintained in the ordinary course of

–17–

business. Attached to his affidavit, he included documents regarding the appellants' funding agreements and reservation/confirmation forms of their investments in certain policies showing the dates of the investments, how much each party paid for their investment, and the percentage of return expected on the investment. Based on these documents, Life Partners argues "most" of appellants' claims are barred by the TSA's statute of limitations.[4] Appellants state in their brief "[t]his affirmative defense implicates some, but not all, of Appellants' claims; even if [it] were a valid defense, it would not justify summary judgment on the entire case."

Appellants attached to their response to Life Partners' partial motion for summary judgment what both parties refer to as "Exhibit W," which is a spread sheet with columns labeled "Insured," "Plaintiff," "Investment Date," "Investment Amount," "Percentage of Death Benefit," "Additional Premium Payment Amount," "Date of Additional Premium Payment," and "Amount of Death Benefit Paid." Life Partners objected to this exhibit as containing inadmissible hearsay and argued it was not properly authenticated under rule of evidence 901. It specifically argued there was no evidence indicating the author of the summary, the date it was created, or the documents it purported to summarize. Life Partners failed to obtain a written ruling on its objection to "Exhibit W" from the trial court.

Objections that a document contains hearsay are defects in form. *S&I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 855 (Tex. App.—Dallas 2011, no pet.). Defects in form cannot be raised on appeal unless the party obtains a written ruling on these objections. *Id*.

An objection to the attempted authentication of a document is usually considered a defect in form; however, we have held that "[a] complete absence of authentication is a defect of substance that is not waived by a party failing to object and may be urged for the first time on

---

[4] Appellants dismissed claims for the following life settlements and acknowledge they are not part of this appeal: Michael Arnold's investment in the Donnan, Blood, and Kricalusi policies and Janet Arnold's investment in the Blood policy; South Living Trust's investment in the Gummelt and Consaul policies; Dr. Ferris's investment in the Rogers policy; and Christine Duncan's investment in the Gummelt, Consaul and Robbins policies.

appeal." *Blanche v. First Nationwide Mortg. Corp.*, 74 S.W.3d 444, 451 (Tex. App.—Dallas 2002, no pet.). While we shall not address Life Partners' hearsay argument because it failed to obtain a written ruling, we do agree that the complete lack of any attempt on appellants' part to authenticate "Exhibit W" is a defect in substance we may consider.

As noted, "Exhibit W" was not attached to an affidavit supporting any facts contained within the document. The record does not contain any information about who created the document, when it was created, or what documents were used to create the summary. Accordingly, we conclude "Exhibit W" is not admissible evidence we may consider to create a fact issue against Life Partners' statute of limitations defense. Rather, we shall rely on the documents attached to the Peden affidavit to determine if Life Partners conclusively established its affirmative defense as a matter of law.

As discussed below we agree with both appellants and Life Partners that some, but not all, of appellants' claims are barred by the statute of limitations. Appellants' Michael and Janet Arnold filed their original petition on March 14, 2011. An amended petition adding Steve South as trustee and on behalf of the South Living Trust and Dr. John Ferris was filed on May 3, 2011. The petition was amended again on June 8, 2011 to add Christine Duncan.

We shall discuss each appellants' investment contracts separately, beginning with Michael Arnold. Article 581–33H(1) is clear that a person may not sue for failure to register a security under article 581–33A(1) more than three years after the *sale* of the security. TEX. REV. CIV. STAT. ANN. art. 581–33H(1) (emphasis in original); *Id*. article 581–33A(1). The evidence attached to Life Partners' summary judgment shows that Michael's investments occurred between March 2005 and March 2006; therefore, to fall within the applicable statute of limitations, he needed to file suit in 2009, which he failed to do.

While he argues he made additional payments on certain policies to keep them from lapsing and such payments were made within the three-year statute of limitations, he provides no authority to support his argument that the payment of additional premiums resulted in the restarting of the statute of limitations. The statute is clear that limitations begin to run from the moment of sale. Moreover, he admitted in his second amended petition that "Once [certain] documents were executed by the life settlement purchaser, the sale of the life settlement was complete." Appellants never pleaded, as they do in their brief, that the "life settlement transactions between investors and LPI are not complete until the viators die because investors could be required to make additional investments to maintain their life insurance contracts." Therefore, he may not now urge this argument on appeal. *See, e.g.*, TEX. R. CIV. P. 166a(c) (noting trial court should grant summary judgment based on the pleadings on file at the time of the hearing); *Prater v. State Farm Lloyds*, 217 S.W.3d 739, 741 (Tex. App.—Dallas 2007, no pet.).

Michael also claims article 581–33A(2), which provides a five-year statute of limitations for claims brought asserting fraud in a securities transaction saves his claims. However, in their second amended petition, appellants alleged " . . . Life Partners, Inc.'s viatical and life settlements are, and have been since the company's inception, securities under the Texas Supreme Court's holding in *Searsy v. Commercial Trading Corp.*, 560 S.W.2d 637, 641 Tex. 1977)." We agree with Life Partners that appellants pled themselves out of any fraud claim because they knew or should have known the viatical settlements were allegedly securities based on the holding in *Searsy*, but chose to invest anyway. Accordingly, Life Partners has conclusively proved its statute of limitations defense as to all of Michael's claims.

Life Partners' summary judgment evidence shows Janet Arnold's investments occurred between April 5, 2005 and July 12, 2005. Like her husband, she failed to file suit within the

required three-year statute of limitations. Moreover, her claims are not saved by any further payment she made on the policies because such payment did not restart the statute of limitations. Nor can she rely on the five-year statute of limitations based on fraud. Accordingly, Life Partners conclusively proved its affirmative defense of statute of limitations against Janet Arnold's claims.

We now consider the investment contracts of Steve South, as trustee on and on behalf of the South Living Trust. Life Partners' summary judgment evidence shows South Living Trust's investments occurred between January 8, 2008 and September 17, 2009. Because the amended petition adding the trust as a party was filed May 3, 2011, those investment contracts purchased after May 3, 2008 are not barred by the three-year statute of limitations under article 581–33H(1). These include the Gross, Soffer, Hagopian, and Gelman investment contracts. For the reasons discussed above, the five-year statute of limitations does not apply to save any of its other claims.

Life Partners' summary judgment evidence shows Dr. John Ferris's investments occurred between May 11, 2007 and August 2, 2007. Dr. Ferris was added to the suit on May 3, 2011. Again, to meet the three-year statute of limitations requirement of article 581–H(1), he needed to file suit by May 11, 2010. Therefore, Dr. Ferris's claims for his investments under the Heazlitt, Jones-Bowden, Cheesman, Teichman, Crawford, Beiber, Kessler, Hyman, Rogers, and Brode remain viable claims. Accordingly, Life Partners failed to conclusively prove its statute of limitations affirmative defense as to these claims.

Finally, we must determine whether Christine Duncan's claims survive Life Partners' statute of limitations argument. The evidence shows her investments occurred between January 9, 2008 and September 17, 2009. Christine was added to the amended petition on June 8, 2011. To meet the three-year statute of limitations requirement of article 581–H(1), she needed to file

–21–

suit by January 9, 2011, which she did. Therefore, all of her claims for her investments in the Soffer, Gross, Nakazaki, Guild, Berger, Rourke, Bongright, Kartzmer, Berman, Zelniker, and Margolis viatical settlements remain viable claims. Accordingly, Life Partners failed to conclusively prove its statute of limitations affirmative defense as to these claims.

In conclusion, viatical settlements are investment contracts and therefore securities as defined under the Texas Securities Act. Moreover, the insurance exception does not apply. After reviewing the evidence regarding the individual appellant's investments, we have concluded which of appellants' investments survive the statute of limitations and may proceed accordingly in the trial court on remand. Thus, we sustain in part, and overrule in part, appellants' first issue.

We now turn to the motion for summary judgment filed by appellee Milkie/Ferguson. The basis for its motion, similar to Life Partners, was that viatical settlements were not investment contracts within the definition of securities under the TSA. Having concluded viatical settlements are securities, we reverse the trial court's order granting summary judgment in favor of Milkie/Ferguson. Therefore, the trial court erred in granting its motion for summary judgment as a matter of law. We sustain appellant's second issue.

Lastly, appellants argue the trial court erred by granting an order for sanctions based on Texas Rule of Civil Procedure 13 and Texas Civil Practice and Remedies Code chapter 9 because "the pleadings as complained of were frivolous and without basis in fact or law."[5] While the court did not award monetary sanctions in the order, it deferred such sanctions until after mediation. Although the court never imposed monetary sanctions, it never withdrew its previous order against appellants.

---

[5] Life Partners later withdrew its argument that sanctions should be imposed under chapter 9 of the Texas Civil Practice and Remedies Code.

Under rule 13, the trial court's imposition of sanctions is within its discretion. *Monroe v. Grider*, 884 S.W.2d 811, 816 (Tex. App.—Dallas 1994, writ denied). A trial court abuses its discretion in imposing sanctions only if it bases its order on an erroneous view of the law or a clearly erroneous assessment of the evidence. Based on our previous determination that the trial court erred in granting part of the summary judgment, we cannot say appellants filed their pleadings in bad faith, to harass appellees, or that they were groundless. TEX. R. CIV. P. 13; *Monroe*, 884 S.W.2d at 816. Therefore, although we acknowledge the trial court never imposed monetary sanctions, we agree with appellants that the trial court's November 29, 2011 sanctions order should be vacated. Accordingly, we sustain appellants' third issue.

## Conclusion

We reverse the trial court's order granting Life Partners' motion for summary judgment as it relates to those appellants' viatical settlement claims that are not excluded by the statute of limitations and remand for further proceedings. In all other respects, we affirm this summary judgment order.

We reverse the trial court's order granting Milkie/Ferguson Investment, Inc.'s motion for summary judgment and render judgment in favor of appellants because, as a matter of law, viatical settlements are investment contracts, which fall under the definition of security for purposes of the TSA.

We also reverse and vacate the trial court's November 29, 2011 sanctions order against appellants.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

120092F.P05

–23–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

MICHAEL ARNOLD, JANET ARNOLD, STEVE SOUTH, AS TRUSTEE AND ON BEHALF OF THE SOUTH LIVING TRUST, JOHN S. FERRIS, M.D., CHRISTINE DUNCAN, AND ALL OTHERS SIMILARLY SITUATED, Appellants

No. 05-12-00092-CV          V.

LIFE PARTNERS, INC., ABUNDANT INCOME LLC,  and MILKIE/FERGUSON INVESTMENT, INC., Appellees

On Appeal from the 14th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 11-02995.
Opinion delivered by Justice O'Neill.
Justices Moseley and Lewis participating.

        In accordance with this Court's opinion of this date, we **REVERSE** the trial court's order on Life Partners, Inc.'s motion for summary judgment as it relates to those appellants' viatical settlement claims that are not excluded by the statute of limitations, and **REMAND** for further proceedings.  In all other respects, we affirm the trial court's summary judgment order.

        We **REVERSE** the trial court's order granting Milkie/Ferguson Investment, Inc.'s motion for summary judgment and **RENDER** judgment in favor of appellants.

        We **REVERSE** and **VACATE** the trial court's November 29, 2011 sanctions order against appellants.

        The Court **ORDERS** that each party bear its own costs of the appeal.

Judgment entered this 28th day of August, 2013.


                                        /Michael J. O'Neill/
                                        MICHAEL J. O'NEILL
                                        JUSTICE

–24–